NOT DESIGNATED FOR PUBLICATION

No. 124,328

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERICK W. OGWANGI,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; BARBARA KAY HUFF, judge. Oral argument held April 9, 2024. Opinion filed May 3, 2024. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Brian Deiter*, assistant district attorney, *Jon Simpson*, senior assistant district attorney, *Suzanne Valdez*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., SCHROEDER, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM: Claiming several trial errors, Erick Ogwangi appeals his rape conviction. To resolve the claims of the accused, we must explore the law on pretrial agreements between the accused and the prosecution. We must also examine the admission of certain testimony and some exhibits at the trial. We will review the actions of the prosecutor during the trial and see if there is an error in the failure to give a requested jury instruction.

1

*A reunion with friends ends in rape.*

The parties refer to the complaining witness as "Emily," so we will as well. Emily and Sandra Yoder met in 2008 in college and became close friends. Later, Emily would become friends with Sandra's husband, Ogwangi, as part of her relationship with Sandra. Ogwangi was "overly flirtatious" with Emily. He flirted with her even in front of Sandra and Emily's boyfriend.

Beginning in 2014, Ogwangi and Emily exchanged sexually explicit messages on Facebook. Emily testified Ogwangi started those conversations. The sexually explicit messages made her uncomfortable, and she tried to steer the conversation to something different. Emily testified that she and Sandra might have joked about being "sister wives" and living a "commune style." Emily understood that Ogwangi and Sandra had an open relationship, but Emily did not have an open relationship with her boyfriend.

In January 2017, Ogwangi and Sandra lived in Lawrence, Kansas, with their two young children. Emily lived in Denver. Emily planned a visit to Kansas around a work conference that was taking place on Saturday, January 28. She and Sandra planned to spend the day together on the Friday before.

On Thursday, January 26, Emily watched Sandra and Ogwangi's children in the afternoon while the parents worked. Sandra arrived home around 5:00 p.m. Emily and Sandra went out to dinner with another friend, Sierra, and the kids. Afterwards, they went to the house and watched TV. Ogwangi got home around 8:30 p.m.

The kids were put to bed—the younger child upstairs in the kids' room and the older child downstairs in the guest bedroom. According to Emily, the plan was for Emily and Sandra to have a sleepover with the older child. After the kids were in bed, the four adults sat on the couch and watched TV. Sandra gave Sierra a back rub because Sierra's

2

back was bothering her. Emily draped her feet over Ogwangi 's knees and joked about Ogwangi giving her a foot rub. Ogwangi rubbed her feet. Ogwangi pulled a blanket over his lap. He then tried to move up her leg, but Emily pushed him away. Emily stated that Ogwangi had never tried to touch her in a sexual way before that. She was uncomfortable but did not want to make a big scene. She believed he was a friend and would stop.

At some point, Sierra left and the remaining adults went to bed. Sandra went upstairs to get ready for bed. According to Sandra, Emily mentioned to Sandra, "[A]m I sleeping with you, are we going upstairs." Sandra said, "[N]o, me and my husband are sleeping in my bed, I'm going upstairs."

Emily testified that the night did not end there. She walked towards the bathroom on the main floor and Ogwangi followed her. Emily noticed him following her and got uncomfortable. She quickly moved into the bathroom and closed the door. Ogwangi tried to push his way into the bathroom. She locked the door and washed her face and brushed her teeth. Ogwangi did not leave. He jiggled the door handle and said, "I love you." Eventually, Emily opened the door and Ogwangi tried to grab her and kissed her. She did not kiss him back. She pushed him away, telling him, "[Y]our wife is upstairs . . . go away." Finally, he let her go and went upstairs. Emily went into the guestroom and lay down in bed with Ogwangi's son. Worrying that Ogwangi would come back, she wrapped her arms around the boy and held him close. She fell asleep.

Ogwangi did come back. Emily awoke when she felt Ogwangi on top of her, pulling off her clothes. The small boy had been moved to the other bed in the guest room. As Ogwangi pulled her clothes off, he said, "I love you, you're so hot." She kicked and pushed him away. She said, "What are you doing. Go away." One of her acrylic nails broke off in the struggle. She did not yell because she did not want to wake the boy up as it would scare him. Ogwangi held her down and put his penis into her vagina. She

3

continued to say, "[G]o away," throughout the encounter. Emily stated that Ogwangi was "really aggressive."

After Ogwangi left the room, Emily texted a friend who lived nearby in town hoping he could help her leave. But it was around 3:30 a.m. and he did not respond. She texted her father, but he also did not respond. She waited until she heard Ogwangi go upstairs. She then grabbed her stuff and left the house. She drove to her parents' house. It was around 4:30 a.m. when she arrived. She then "started crying and couldn't stop crying." She woke up her mother and told her what happened.

*Emily is examined and then reports the incident to the police.*

Around 6 a.m., accompanied by her parents, Emily went to the hospital for a forensic sexual assault examination. Seminal fluid with Ogwangi's DNA was found in Emily's cervix and vagina. Emily had abrasions in the vaginal area. The forensic nurse examiner testified that abrasions can occur in consensual and nonconsensual sex.

When they returned home from the hospital, Emily's mom called Sandra and told her what happened. Emily showered and fell asleep. That morning, Emily also called her boyfriend and told him what happened. According to him, she was "very distraught and coming a little bit unraveled."

On Tuesday, January 31, Emily reported to law enforcement officers that Ogwangi had raped her. The next day, detectives asked her to call Ogwangi on her cell phone to see if he would talk to her. Emily agreed to make the call and to allow the detectives to record the call. At this point, no law enforcement officer had contacted Ogwangi. At around 2:30 p.m., Emily made the call from an interview room in the police station. Detectives suggested questions that Emily could ask him. They told her she could end the

4

call at any point or not make the call at all. Emily was alone in the interview room during the phone call. Detectives showed her how to use the recording device.

During the call, Ogwangi expressed regret stating, "[I]t just breaks my heart. I don't know what I can do to make it up for you." "I just don't know what came over me." He said, "I just feel like I don't even need to live anymore if I can do something like that to someone I care so much about." Ogwangi's children could be heard in the background. Emily ended the call after less than five minutes.

The police searched Ogwangi's home later that day. Near the washer and dryer, they found Emily's acrylic fingernail. The mattress cover and sheet from one of the beds in the guest room had been washed. That was the only bed in the home with its bedding removed.

That evening, Ogwangi left Emily a voicemail expressing confusion that he was being accused of rape. He referenced their activity on the couch earlier that night and alleged that she had kissed him back in the bathroom. He said that Emily had asked to share the bed with him and Sandra that night. Emily did not know what he was referring to.

*The State charges Ogwangi.*

In November 2018, Ogwangi was charged with rape, a severity level one person felony. The trial took place in May 2021. This was during the days of the Covid pandemic when social distancing was mandated, so the trial was held at the fairgrounds. He did not testify at trial. The jury found him guilty as charged. The court sentenced Ogwangi to 147 months in prison with lifetime postrelease supervision.

*Did the State trick the defense?*

Ogwangi stridently argues the State used "bait-and-switch tactics" by agreeing not to present certain evidence at trial—some text messages and the testimony of Emily's therapist—but then presenting substantially the same evidence through Emily's testimony. He contends that the State did not act in good faith and did not deliver on the pretrial agreements it made. He received no benefit from his bargains. The substance of the evidence—not its source—was at issue during the pretrial discussions. He cites *State v. Coleman*, 253 Kan. 335, 347, 856 P.2d 121 (1993), as support.

And, the accused maintains that evidence of Sandra's opinion on Emily's credibility should have been excluded under the rule in *State v. Elnicki*, 279 Kan. 47, Syl. ¶ 3, 105 P.3d 1222 (2005), even if there were no pretrial agreement. In his view, this was particularly damaging testimony because it appeared Ogwangi's wife was taking Emily's side. The major question for the jury was whether the sexual intercourse was forced or consensual.

He argues the State's case is a question of credibility. The jurors were likely to defer to Sandra's assessment of Emily and Ogwangi's credibility. He argues this court should have unlimited review over his claims that the testimony contained an improper opinion on credibility and that the State breached the pretrial agreements, likening the breach of a pretrial agreement to the breach of a plea agreement.

The State's viewpoint on these claims is less strident. The State argues the trial court properly exercised its discretion to admit the evidence over Ogwangi's objections. Pretrial agreements are not constitutionally significant. The prosecution argues that it did not violate the pretrial agreements nor did the State bait the defense into narrowing its objections to certain evidence. The State argues the testimony did not constitute "'direct comments'" from Sandra on Emily's credibility. And Emily's testimony about her therapy

spanned only four lines of one page of the transcript of the trial and was not discussed. In other words, it was insignificant.

Jury trials are arduous and expensive. Pretrial agreements are encouraged in Kansas. If a pretrial conference is held, "both parties are bound by the agreements made at the conference and included by the judge in the order entered at the conclusion of the conference. . . . If the pretrial order could result in manifest injustice, the trial court has authority to modify the order." *State v. Coleman*, 253 Kan. 335, 347, 856 P.2d 121 (1993).

Even so, the district court can err by disregarding factors other than the agreement's mere violation. In *Coleman*, the defense agreed to provide the State with a list of defense witnesses before trial. On the third day of trial, the defense attempted to call a witness who was not on the list. The district court ruled the pretrial order was binding. The Supreme Court reversed. It held the district court erred by disregarding several factors including why the witness was not disclosed, when the witness first became known to the defense, whether the nondisclosure was willful or inadvertent, whether the proposed testimony was trivial or substantial, the extent of prejudice to the State, the importance of the witness to the defense, and whether prejudice could be avoided by granting a recess. 253 Kan. at 348, 351. In other words, a court must consider all the circumstances and take whatever actions are necessary to promote justice.

*Our standard of review is abuse of discretion.*

How we review these contracts varies with their subjects. In general, contracts contain implied covenants of good faith and fair dealing. Parties "must act fairly and in good faith in carrying out the promises they have made." Our Supreme Court has held that whether the State breached a *plea agreement* is a question of law subject to unlimited review. See *State v. Urista*, 296 Kan. 576, 582-83, 293 P.3d 738 (2013).

7

In contrast, a district court's determination whether an *order in limine* has been violated is reviewed for abuse of discretion. "A trial court is generally in the best position to decide whether such a violation has occurred." *State v. Sims*, 308 Kan. 1488, 1497, 431 P.3d 288 (2018). The trial court's decision that certain testimony did not violate its order will be reversed only if no reasonable person would agree with the trial court. See *State v. Bowen*, 254 Kan. 618, 623-24, 867 P.2d 1024 (1994) (finding no abuse of discretion in the trial court's ruling that the State did not violate order prohibiting evidence of gang membership because officer's testimony that he was assigned to the sheriff's gang task force did not link the defendant or the defendant's alleged crime to a gang).

The *Coleman* court ultimately reviewed the district court's decision to exclude testimony in accordance with the pretrial agreement for abuse of discretion. "It is within the trial court's discretion, subject to exclusionary rules, whether to admit or to exclude evidence. [Citation omitted.]" 253 Kan. at 344.

The pretrial representations made before the trial court and the court's orders here are more like rulings on a motion in limine than the usual representations made in plea agreements. We hold, in accordance with *Coleman*, the proper standard of review is an abuse of discretion. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023).

*The State agrees not to present certain text messages.*

On the Friday and Sunday after the rape, Sandra sent several text messages to Emily implicating Ogwangi. Some of those messages said:

"I can't make what Erick did ok and he is fully responsible for it. We understand if you want to press charges. We will be ok. Whenever you're comfortable talking to me you can. I love you."

"Well I love you and Erick did something awful. I want you to feel safe and I hate that he took that from you in my house. I understand if you don't want to see him, or me, but if you want to talk things through with me or see me somewhere else or anything at all just let me know."

"Hey love, I can't imagine what you must be going through but I know it hurts and I'm so sorry. I just want you to know: . . . I want you to feel free to do whatever you need to get justice if that's possible for you. . . . I know you're thinking of me a lot right now but please think of you and your needs first."

"About the sheets . . . we don't want you to feel like you need more proof or anything. Erick is going to talk to a lawyer tomorrow about what it would look like to turn himself in."

Before trial, Ogwangi filed a motion in limine "to prohibit the State from admitting irrelevant and prejudicial texts between Sandra Yoder and [Emily] that violate *State v. Elnicki* pursuant to Kansas case law and under the United States Constitution and the Kansas Constitution." Ogwangi argued the messages would constitute improper opinion testimony on Emily's credibility and Ogwangi's guilt.

At the motion hearing, the State revealed it was not going to admit the text messages in its case in chief. Rather, the text messages would be reserved for cross-examination or rebuttal if Sandra testified. Defense counsel agreed. The court made a record that the "motion is withdrawn as moot given the State's concession that this is not proper evidence for their case in chief."

9

The court further ordered the evidence at issue be admitted "so that it is clear on the record what text we are talking about and what the State has said will not be part of the case in chief." The court admitted a series of text messages as State's Exhibit 1, saying "we are simply making a record that this evidence will not be admitted on the case in chief."

*Did the State breach its agreement with the defendant?*

During its opening argument, the State described a conversation Emily and Sandra had on Sunday during which Sandra told Emily, "[Y]ou do what you need to do take care of yourself. We'll be fine. I'm going to save the sheets in case you need them. We're going to talk to a lawyer so he can turn himself in." Ogwangi objected because the State had agreed not to use the text messages in its case in chief. The State replied, "These are conversations, Your Honor, not text messages." The court overruled the objection.

The State did not ask about or admit the text messages at trial. Instead, the State asked Emily about the in-person conversation she had with Sandra on Sunday. Sandra went to Emily's parents' house to talk with her on Sunday. Ogwangi objected, citing to *Elnicki*, which prohibits a witness from expressing an opinion on the credibility of another witness. Ogwangi also argued the State should be held to its pretrial agreement to not admit Sandra's opinion. The State argued that only the text messages were discussed pretrial and that the evidence was not offered to address the credibility of any witness but to address Emily's immediate response to the rape. The court overruled the objection.

Emily testified that she and Sandra discussed that Ogwangi had raped her. Emily testified, "She knew that he'd assaulted me." Sandra offered Emily support. Sandra told Emily to "[d]o whatever you need to do to take care of yourself. If you . . . decide you want to report . . . I'm not going to be mad at you. You need to do what you need to do to heal and be okay." Sandra said she had taken the sheets off the bed and put them aside in

10

case Emily made a report. Emily testified that hearing Sandra say it "would be okay" made a big impact on her decision to file a police report.

We find no abuse of discretion here. The trial court did not abuse its discretion in overruling the objection that the State violated the parties' pretrial agreement. At the pretrial hearing, the State agreed not to present the *text messages* in its case in chief because of "hearsay issues or some other stuff." The text messages were admitted at the hearing as an exhibit so the record would be clear what the State had agreed to. The State specifically did *not* agree the substance of the evidence was inadmissible under *Elnicki*: "I'm not sure it's a violation of *Elnicki*. I think it's just maybe a question of relevance and admissibility." The State said it "would definitely use" the text messages in cross-examination or rebuttal if Sandra testified.

The trial court also did not err in admitting the testimony over the *Elnicki* objection. It is a well-known rule that a witness may not express an opinion on the credibility of another witness. The determination of the truthfulness of a witness is for the jury. *State v. Green*, 311 Kan. 960, 992, 469 P.3d 1228 (2020). The trial court has no discretion to allow a witness to express an opinion on the credibility of another witness; such evidence must be disallowed as a matter of law. *Elnicki*, 279 Kan. at 53-54. The *Elnicki* court held it was error to play a recorded interrogation where a law enforcement officer repeatedly called the defendant a liar:

> "The jury heard a law enforcement figure repeatedly tell Elnicki that he was a liar; that Elnicki was 'bullshitting' him and 'weaving a web of lies.' The jury also heard the same law enforcement figure suggesting he could tell Elnicki was lying because Elnicki's eyes shifted. A jury is clearly prohibited from hearing such statements . . . ." 279 Kan. at 57.

Asking for a witness' opinion on another witness' credibility, even if done indirectly, is improper. *State v. Drayton*, 285 Kan. 689, 700, 175 P.3d 861 (2008).

11

*Elnicki* has been distinguished by this court many times. In *State v. Swann*, No. 102,023, 2011 WL 1344728, at *20 (Kan. App. 2011) (unpublished opinion), the panel held a detective's statement during a recorded interview of the defendant was permissible because it was not a "direct comment[] on Swann's lack of credibility." A detective stated, "Unfortunately your first foray into the world of robbery was not a good one." Swann replied, "I'm not a robber." The other detective replied, "[T]hat was a robbery." 2011 WL 1344728, at *19.

In *Skaggs v. State*, 108,644, 2014 WL 1193324, at *3 (Kan. App. 2014) (unpublished opinion), a detective's interview of a child victim was played for the jury. The detective said,

> "'Well you've got every right to be angry with him. And you did nothing wrong. Ok? Like I said you're being very brave about talking with me about it and it takes a lot of guts to talk to people about this stuff. . . . I'm gonna make it so I'm gonna make sure you're ok.'" 2014 WL 1193324, at *3.

A panel of this court held the detective's comments were merely "calming and reassuring remarks to an anxious child . . . not a straightforward expression by [the detective] of his belief in [the child's] credibility." 2014 WL 1193324, at *6.

Then, in *Hunt v. State*, 48 Kan. App. 2d 1023, 1030-31, 301 P.3d 755 (2013), the defendant's brothers testified that in the days following their mother's murder, they suspected Hunt was involved. When one of the brothers was asked if he still believed that he killed her, the trial court sustained the defense counsel's objection. On appeal, the panel held the testimony from the brothers did not invade the jury's role to determine guilt or innocence because it was "limited in both scope and time to the perceptions and beliefs they held while the police were investigating the murder in the few days after their mother's body had been discovered." 48 Kan. App. 2d at 1034.

12

Emily's testimony about her discussion with Sandra was far different from the recorded interrogation in *Elnicki* where an officer repeatedly called the defendant a liar. Here, the testimony came from the victim herself. It was merely Emily's characterization of a conversation she had with Sandra. The testimony that came closest to a statement on credibility was when Emily testified Sandra "knew that he'd assaulted me." But that was Emily's own characterization of Sandra's apparent knowledge—not a reference to anything specifically said by Sandra. When asked if she and Sandra had discussed that Ogwangi raped her, Emily said, "We did, yeah." Again, that was Emily's characterization of the discussion, not a statement by Sandra that she believed Emily. Emily herself characterized what happened as rape, which is less prejudicial than the detective in *Swann* saying, "[T]hat was a robbery."

It appears that the statements that Sandra made to Emily were offers of support rather than statements of belief or nonbelief. According to Emily, Sandra told Emily to "[d]o whatever you need to do to take care of yourself. If you . . . decide you want to report . . . I'm not going to be mad at you. You need to do what you need to do to heal and be okay." As in *Skaggs*, the statements were "calming and reassuring remarks" not an expression on credibility. Emily and Sandra were close friends. The testimony explained why Emily at first hesitated but eventually reported the rape on Tuesday.

Moreover, like in *Hunt*, any perception or belief of Sandra that may have been implied by the conversation between Emily and Sandra was limited in scope and time to the perceptions and beliefs she held in the days after the alleged rape. Emily was not asked and did not insinuate that Sandra believed her at the time of trial.

In sum, we find no reversible abuse of discretion here.

13

*We address the question about admission of the therapist evidence.*

Before trial, Ogwangi sought discovery of "any and all material or relevant treatment or counseling records." The prior assistant district attorney had stated Emily was not in therapy. That statement was inaccurate. Emily began therapy in March 2017. The State moved to endorse Emily's therapist as a witness. Ogwangi objected because the State did not disclose that Emily was in therapy until about a week before trial. Defense counsel suggested she would file a motion for discovery sanctions. The State said it did not anticipate calling the therapist as a witness in its case in chief. The court made a record that the parties had agreed the therapist would not be called as a witness and directed that the State turn over the therapy records submitted to the court for *in camera* review. The court stated that if there were further issues that came up regarding the therapy records, the parties could bring them to the court's attention.

Emily testified that she began therapy because of the rape. She was diagnosed with PTSD. Ogwangi objected to this testimony. He argued the State had not alerted the defense that Emily was in therapy until a few days before trial and had not turned over any records documenting the therapy, despite requests for discovery. As a discovery sanction, Emily should not be permitted to testify about her therapy or diagnosis. And the State should be held to its pretrial agreement not to admit the therapy evidence. The trial court overruled the objections, noting that the State had provided defense counsel with the therapy records as instructed after they were reviewed by the court, so the diagnosis was not a surprise to the defense.

We find no abuse of discretion in overruling the objection that the State violated the pretrial agreement regarding Emily's therapist. The State simply stated at the pretrial hearing that it did not anticipate calling the therapist in its case in chief. Rather than rule on the defense objection to the State's motion to endorse the therapist as a witness, the court interpreted the State's representation at the hearing as an agreement by the State not

14

to call the therapist in its case in chief. We found no larger agreement made between the parties in the record. Rather, the court instructed that further issues about the therapy records be brought to its attention. The trial court was in the best position to judge whether the pretrial representations and orders had been violated. There is no reversible error here.

*Was the recording of Emily's phone call with Ogwangi admissible?*

Before trial, Ogwangi moved to suppress the recorded phone call. He argued Emily was acting as an agent of law enforcement and therefore he was entitled to *Miranda* protections and, even if it were not a custodial interview, the statement was involuntary and unduly coerced. The trial court denied the motion in a written order. Ogwangi again objected when the State sought to admit the recording at trial. The objection was overruled, but the question was preserved for appellate review.

The trial court found the phone call was not a custodial interrogation that required *Miranda* warnings. Ogwangi's whereabouts during the call were not known, but there were no restrictions on his liberty. His children could be heard in the background. He had not been contacted by the police and was not under arrest. The call was not long, and he could have hung up at any time. Emily was crying and asked how he could do this to her, but she did not threaten Ogwangi. Her statements were not inherently coercive or overbearing. The court found that the defendant's will was not overborne and that his statements were voluntary.

To us, Ogwangi argues his statements on the recorded phone call were involuntary because he was deceived into believing the call was "from a distressed friend seeking to salvage a fractured relationship." This deception rendered his statements involuntary. The deception was fundamentally unfair. Without this pretense, officers could not have questioned Ogwangi without providing *Miranda* warnings. He focuses his challenge on

15

"the fundamental unfairness of the way that the police put this together." He argues the "lack of traditional indicators of coercion" make his statements involuntary. He disputes the trial court's legal analysis, not its factual findings. He relies on *State v. Morton*, 286 Kan. 632, 652-54, 186 P.3d 785 (2008).

We use a two-step analysis when reviewing a decision on a motion to suppress a confession. First, an appellate court reviews the factual underpinnings of the ruling using a substantial competent evidence standard. Second, an appellate court considers the ultimate legal conclusion drawn from those facts de novo. *State v. Bentley*, 317 Kan. 222, 228, 526 P.3d 1060 (2023).

The rules are clearcut and well established. "Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination." Procedural safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. *State v. Parker*, 311 Kan. 255, 257, 459 P.3d 793 (2020).

"A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. [Citations omitted.]" *State v. Guein*, 309 Kan. 1245, 1253-54, 444 P.3d 340 (2019).

"Unwarned inculpatory statements obtained through noncustodial interrogation, although not barred by *Miranda,* may nevertheless be inadmissible if they were obtained in violation of the due process voluntariness requirement." *Morton*, 286 Kan. at 649.

16

The State has the burden to prove the voluntariness of a confession by a preponderance of the evidence that the statement derived from the defendant's free and independent will. The court looks at all the circumstances of the confession to determine whether the confession was voluntary by considering the following nonexclusive factors: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the defendant to communicate on request with the outside world; (4) the defendant's age, intellect, and background; (5) *the fairness of the officers in conducting the interrogation*; and (6) the defendant's fluency with the English language. *Bentley*, 317 Kan. at 228-29.

> "'These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citation omitted.]" *State v. Mattox*, 305 Kan. 1015, 1043, 390 P.3d 514 (2017).

In *Morton*, the Ottawa Police Department investigated Morton for personal use of travel trailers that were purchased through a federal surplus property program. Morton was represented by an attorney during the investigation. After the Ottawa Police Department completed its report, the Government Services Administration began its own investigation. Special Agent John Pontius, a criminal investigator with the GSA, did a follow-up interview. Agent Pontius got in touch with Morton. Morton asked if she would need an attorney. Agent Pontius told her, "'[N]o, it's not that kind of interview.'" Morton believed the criminal investigation was over. She had read in the paper that the county attorney had declined to prosecute, and her attorney told her it was over. She agreed to meet the agent at the police station without an attorney. Morton was not in custody during the interview and was not given *Miranda* warnings. 286 Kan. at 634-37.

17

The question on appeal was whether the officer's conduct was unfair in conducting the interview. All the other circumstances of the interview suggested Morton's statements were voluntarily made. 286 Kan. at 651, 654. Our Supreme Court concluded the confession was involuntary. The agent's conduct—including telling the defendant that she did not need an attorney for the interview because it was not "'that kind'" of interview—rendered her statement involuntary and thus inadmissible. 286 Kan. 632, Syl. ¶ 9.

> "Morton had an attorney who had represented her during this criminal investigation concerning the trailers and it was her intent and desire to have the benefit of the advice and presence of counsel in this criminal investigation. Had she known Agent Pontius was conducting a criminal investigation, she would not have agreed to the interview without the advice and presence of counsel. We consider this in conjunction with the facts that Morton believed the criminal investigation had ended and the agent's status as a criminal investigator was not patently apparent. Under these circumstances, by reason of the agent's conduct, Morton's participation in the interview and the statements given therein were not the product of her free and independent will. Accordingly, Morton's statements were involuntary and, thus, inadmissible." 286 Kan. at 654.

*Morton* is nothing like this case. Ogwangi was not advised by a law enforcement officer or anyone else that he did not need an attorney. He had not hired an attorney for the matter. He had not been advised there would be no criminal investigation. He was not being interviewed by a law enforcement officer at a police station. He had had no prior contact with law enforcement on the matter. He received no assurances about the nature of the phone call with Emily. He received no assurance from Emily that she was not working with law enforcement.

A state agent may tape record a phone call between a suspect and a person acting as an agent of the state. When a defendant's incriminating statements to the government agent are not the product of any sort of coercion, no right protected by the Fifth Amendment is violated by admitting the agent's testimony and the tapes. *State v. Daniels*,

18

215 Kan. 164, 167, 523 P.2d 368 (1974). "No protection is afforded a wrongdoer in his misplaced belief that a person to whom he confides his wrongdoing will not reveal it." *State v. Jordan*, 220 Kan. 110, 115-16, 551 P.2d 773 (1976).

"Coercion is determined from the perspective of the suspect." *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990). Questioning by officers— who appear to control the suspect's fate—can create mutually reinforcing pressures that weaken the suspect's will. But where suspects do not know that they are speaking with a government agent, these pressures do not exist. When suspects consider themselves in the company of a friend and not officers, the coercive atmosphere is lacking. See 496 U.S. at 296-97. "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow . . . ." 496 U.S. at 297. "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." 496 U.S. at 297-98. That a suspect is fooled into thinking they are speaking with a sympathetic friend does not make the statement involuntary. See 496 U.S. at 298. "Where the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced." 496 U.S. at 299.

In *State v. Lansford*, No. 107,918, 2013 WL 5610212, at *1 (Kan. App. 2013) (unpublished opinion), Lansford was accused of aggravated indecent liberties of a five-year-old girl. A law enforcement officer arranged for the girl's father to make two phone calls to Lansford. During the calls the officer sat next to the father and handed him notes directing him what to say. Lansford was not in custody. Lansford could have hung up the phone at any time during the calls. The father falsely led Lansford to believe that the police were unaware of the accusations. The father reassured Lansford that if he told the truth, their friendship might survive; he might be able to keep his wife from involving the police; and the girl would not have to endure an invasive physical examination. A panel of this court rejected Lansford's claim the phone calls were fundamentally unfair because

law enforcement used his close friend as an agent of law enforcement to overcome his free and independent will. The panel found, "None of these interrogation tactics demonstrates coercion." 2013 WL 5610212, at *2, 8, 9.

Here, the facts persuade us that the defendant's statements were voluntarily made. Ogwangi believed he was speaking to a close friend and did not know he was being recorded by law enforcement. When we take that together with all the other undisputed circumstances, it suggests a lack of coercion. Ogwangi had no reason to feel that his liberty was in danger if he refused to speak to Emily. These circumstances do not establish that Ogwangi's free and independent will was overborne. His statements were voluntary. There is no reversible error here.

*The trial court did not err by refusing to give Ogwangi's proposed instruction.*

Ogwangi proposed the following jury instruction based on a jury instruction approved by the United States 10th Circuit:

"Evidence has been presented about a statement attributed to the defendant alleged to have been made after the commission of the crime charged in this case but not made in court. Such evidence should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

"In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, and physical and mental condition of the defendant, and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.

"After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely."

The State objected because it was not a PIK instruction. The trial court declined to give the instruction.

The court, however, did instruct the jury: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

To us, Ogwangi argues the trial court erred by refusing the instruction because it would have provided the jury with necessary guidance in determining how much weight to give his statement. He cites K.S.A. 22-3215(5) and *State v. Oliver*, 280 Kan. 681, 694, 124 P.3d 493 (2005), as support. In opposition, the State argues the requested instruction finds no support in Kansas law. Rather, K.S.A. 22-3215(5) entitles a defendant only to *evidence* bearing upon the credence to be given a confession or admission and not to a *special instruction*. The State contrasts the federal statute from which the proposed instruction originates. The State cites PIK Crim. 4th 51.210 and *State v. Harwick*, 220 Kan. 572, 577-78, 552 P.2d 987 (1976).

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the issue is preserved for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be considered harmless. See K.S.A. 22-3414(3); *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). Ogwangi preserved the issue for appeal by requesting the instruction.

At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant

21

or the requesting party, that would have supported the instruction. *Holley*, 313 Kan. at 254-55.

Appellate courts consider jury instructions as a whole—without focusing on any single instruction in isolation—to determine whether they properly and fairly state the applicable law or if it is reasonable to conclude that they could have misled the jury. *State v. Buck-Schrag*, 312 Kan. 540, 553, 477 P.3d 1013 (2020).

The Kansas Supreme Court strongly recommends the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions. PIK instructions should generally be the starting point when preparing any set of jury instructions. A district court, however, may modify or add clarifications to PIK instructions if the particular facts in a given case warrant such a change. *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022).

The PIK Committee does not merely omit Ogwangi's requested instruction, the Committee recommends that there be no such instruction. PIK Crim. 4th 51.210 ("The Committee recommends that there be no separate instruction given as to confession."). The comment states, "The Committee's recommendation was noted with apparent approval in *State v. Shaffer,* 229 Kan. 310, 316, 624 P.2d 440 (1981), and with specific approval in *State v. Mason,* 238 Kan. 129, 133, 708 P.2d 963 (1985)." PIK Crim. 4th 51.210.

Kansas law differs from federal law. Ogwangi's proposed instruction comes from the 10th Circuit pattern jury instructions. Pattern Crim. Jury Instr. 10th Cir. 1.25 (2023). The proposed instruction seemingly originates from 18 U.S.C. § 3501(a), which requires the trial judge to not only "permit the jury to hear relevant evidence on the issue of voluntariness" of a confession, but also to "instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." 18 U.S.C. § 3501(a).

22

See *United States v. March*, 999 F.2d 456, 462 (10th Cir. 1993). In contrast, K.S.A. 22-3215(5) does not mention such an instruction.

K.S.A. 22-3215(5) merely gives the district court discretion to admit evidence of the circumstances surrounding the making of a confession: "The issue of the admissibility of the confession or admission shall not be submitted to the jury. The circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission." K.S.A. 22-3215(5); see *Oliver*, 280 Kan. at 694; *Harwick*, 220 Kan. at 577-78.

Ogwangi makes no compelling argument that his case warranted a change from the PIK recommendation. See *Zeiner*, 316 Kan. at 353. The jury heard no evidence concerning many of the factors mentioned in the requested instruction—"age, gender, training, education, occupation, and physical and mental condition." Ogwangi was not subject to an "interrogation" or "questioning by government officials." The requested instruction was not legally and factually appropriate.

Kansas courts have repeatedly held "a special instruction bearing on the credence to be given a confession is not required when the jury is given a general instruction bearing on the credibility of the testimony of every witness." *Mason*, 238 Kan. at 133-34; *Shaffer*, 229 Kan. at 316; *Harwick*, 220 Kan. at 577-78; *State v. Swanigan*, No. 88,347, 2003 WL 22990130, at *9 (Kan. App. 2003) (unpublished opinion).

Here, Ogwangi's jury was given the general instruction: "It is for you to determine the weight and credit to be given the testimony of each witness." That is sufficient here.

The trial court did not err as a matter of law by refusing to give the special instruction.

*We review four claimed prosecutor errors and we find one to be an error.*

Ogwangi argues several prosecutorial errors converged to deny him a fair trial. We use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

The extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). See *State v. Rhoiney*, 314 Kan. 497, 501, 501 P.3d 368 (2021)

*.A detective comments on Ogwangi's choice to remain silent.*

During trial, the State asked Sergeant Eric Barkley if he spoke to Ogwangi when executing the search warrant. The officer responded, "Briefly." The State asked, "And

what did he tell you?" The officer responded, "He—primarily he spoke with Detective Harvey. And he wanted to—did not want to speak because he wanted to retain an attorney." Defense counsel objected. The trial court sustained the objection and instructed the jury to "disregard that remark." In ruling on Ogwangi's motion for a new trial, the trial court said the prosecutor's question was improper but that it was one question in a four-day trial. The prosecutor did not mention it again. The jury was instructed properly. Therefore, no prejudice warranted a new trial.

Ogwangi argues the State improperly impeached his credibility with his choice to retain an attorney and remain silent in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Once the error was made, the defense could not "unring" the bell.

The State argues Ogwangi fails to designate a record showing that this is a *Doyle* violation. The rule in *Doyle* does not apply before a suspect has received *Miranda* warnings. Ogwangi was not arrested until over a year later. The State also argues the defense opened the door and that the question causes Ogwangi no prejudice.

It is generally impermissible for the State to impeach a defendant with the defendant's post-*Miranda* silence. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016) (citing *Doyle*, 426 U.S. at 618-19), *disapproved of on other grounds by State v. Randle*, 311 Kan. 468, 462 P.3d 624 (2020). A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility by arguing that the invocation of his or her right to silence or counsel evidences guilt. *State v. Cosby*, 285 Kan. 230, 244-45, 169 P.3d 1128 (2007).

A prosecutor's reference to a defendant's prearrest or pre-*Miranda* silence is not a *Doyle* violation. *Fisher*, 304 Kan. at 249; *State v. Reed*, 300 Kan. 494, 510-11, 332 P.3d 172 (2014). "Central to *Doyle* is the idea that when the government advises a defendant

of his or her *Miranda* rights, it has induced the defendant's silence by impliedly assuring the defendant that his or her silence will not be used against him or her." It violates due process for the government to then comment on—or to use for impeachment purposes—silence induced by such *Miranda* warnings. *State v. Carter*, 30 Kan. App. 2d 1247, 1250, 57 P.3d 825 (2002).

Even so, we note that the reversal of a conviction is not automatic when a *Doyle* error occurs. The Kansas Supreme Court has upheld convictions when, for example, evidence of a defendant's guilt was overwhelming. The court has reversed convictions where the fact-finder's assessment of the defendant's credibility tended to be a central issue at trial and the district court gave no curative instruction. *Fisher*, 304 Kan. at 249. A single comment by an officer concerning the defendant's post-*Miranda* silence that was not elicited by the prosecutor has been held to be harmless error in cases where the State did not mention the matter again and the evidence of the defendant's guilt was strong. See *State v. Murray*, 285 Kan. 503, 523-28, 174 P.3d 407 (2008), *abrogated on other grounds by State v. Marshall*, 294 Kan. 850, 859-60, 281 P.3d 1112 (2012).

The appellant bears the burden of furnishing a record which affirmatively shows that prejudicial conduct occurred in the trial court. *Carter*, 30 Kan. App. 2d at 1250-51.

Our Supreme Court has, at times, excused the lack of record on appeal. This happens when the record established that the defendant had been arrested but did not establish precisely when the *Miranda* warnings had been given during the arrest. A lack of record has also been excused where the State invited the district court to "forego the opportunity to clarify the record regarding whether *Miranda* warnings had been given." In those cases, the State had asked the district court to rule that the defense had opened the door to the line of questioning. *State v. Tully*, 293 Kan. 176, 190-91, 262 P.3d 314 (2011); *State v. Chandler*, 307 Kan. 657, 694, 414 P.3d 713 (2018).

26

Those circumstances excusing a lack of record are not present here. The record does not indicate that Ogwangi was arrested or given *Miranda* warnings on the day of the search. It appears he was not arrested until November 2018 when an arrest warrant was issued. The district court too quickly sustained the defense objection without an opportunity for the State to respond after Sergeant Barkley said Ogwangi "did not want to speak because he wanted to retain an attorney." The prosecutor did not err under the ruling in *Doyle* by asking the question, "[W]hat did [Ogwangi] tell you?" Ogwangi had not been arrested.

*The prosecutor used an improper jigsaw puzzle analogy to explain the State's burden of proof.*

The State began its opening statement by saying, "We all do jigsaw puzzles, right? Some of the pieces fit; some of the pieces don't. . . . Sometimes there's a missing piece. Even if there is a missing piece, we still know what that puzzle looks like. We still know what the picture is. If we have enough pieces, we put the picture together so it makes sense." The State ended its opening statement with, "[W]hen you hear the testimony and the evidence from all of these individuals, and you take each piece of the puzzle and you put it together, you will have a picture that shows the State has met its burden of proof beyond a reasonable doubt."

The State, through a different prosecutor, began its closing statement by saying, "As my colleague Ms. Hartz told you in her opening statement, this case will be like a jigsaw puzzle. And when you take each piece of the puzzle and you put it together, you will have a picture that shows that the State has met its burden of proof beyond a reasonable doubt."

On appeal, Ogwangi argues the State watered down its burden of proof with the puzzle analogy in violation of *State v. Crawford*, 300 Kan. 740, Syl. ¶ 7, 334 P.3d 311

27

(2014), and *State v. Sherman*, 305 Kan. 88, 117, 378 P.3d 1060 (2016). The State argues the prosecutors at most "scuffed the line of error without actually crossing it." The prosecutors' remarks lacked the critical feature which made the puzzle analogies used in *Crawford* and *Sherman* erroneous. The prosecutors here did not use the puzzle analogy to define reasonable doubt or suggest the jury knew the puzzle's image ahead of time.

We must be blunt. It is a misstatement of the law and outside the wide latitude permitted prosecutors to use a puzzle-with-a-missing-piece analogy to discuss the reasonable doubt standard during opening and closing arguments.

There are consistent warnings in Kansas precedent against such explanations because they have the effect of minimizing the State's burden of proof. *Sherman*, 305 Kan. 88, 115-18; *Crawford*, 300 Kan. at 752-55. "Such illustrations are inappropriate because they foster the illusion that the jurors already know the full picture of the case they are hearing and are simply looking for pieces of evidence to match it." *Sherman*, 305 Kan. at 116. The puzzle analogy is error when the prosecutor leaves the impression the reasonable doubt standard may be met by a few pieces of evidence because the jurors can recognize the picture long before all the pieces are in place. See *Sherman*, 305 Kan. at 115-16.

In *Crawford*, the prosecutor erred saying,

"You have seen jigsaw puzzles. Have you seen jigsaw puzzles where maybe one or two pieces, a couple pieces are missing throughout the puzzle? . . . [T]he scene is a lighthouse and the ocean . . . If you're missing some of the pieces to the lighthouse and some of the pieces to the ocean, . . . even though there's some pieces missing, you're able to say that looks like a lighthouse and an ocean . . . That's kind of what I'm talking about is reasonable doubt." 300 Kan. at 751.

28

In *Sherman*, the court held it would be error for a prosecutor to show a photo of Mount Rushmore with Theodore Roosevelt's face removed and ask: "Do you have a reasonable doubt this is Mt. Rushmore?" The prosecutor said, "Every case always has some gaps. And like the jury instructions said it's up to you to listen to the witnesses' testimony and use your life experience and inferences as to what happened in this case." 305 Kan. at 96, 115.

But differences in wording between cases may mean the prosecutor scuffed the line without crossing it. The prosecutor may distinguish between having no doubt and having a reasonable doubt. *Sherman*, 305 Kan. at 115; *State v. Stevenson*, 297 Kan. 49, 55, 298 P.3d 303 (2013). There is no error if the prosecutor does not tie the analogy to the reasonable doubt standard. *State v. Lowery*, 308 Kan. 1183, 1204, 427 P.3d 865 (2018).

The prosecutors' statements here are indistinguishable from the prosecutor's statements in *Crawford*. Here, the first prosecutor told the jurors that they know what the picture looks like even when pieces are missing. Both prosecutors explicitly tied the analogy to reasonable doubt. The prosecutors' statements could leave the impression that once the jurors can recognize the picture, the State has met its reasonable doubt burden of proof. This was error.

But, we hold that the error was harmless beyond a reasonable doubt. We see that the trial court properly instructed the jury on reasonable doubt. The State presented a compelling case. It was a credibility contest, but the defense did not seriously contest Emily's credibility. There was no reasonable possibility that the error contributed to the verdict. See *Sherman*, 305 Kan. at 109.

29

*The prosecutor comments that the defense has subpoena power.*

During Ogwangi's closing argument, defense counsel argued that the police did not do a thorough investigation. They did not collect all the evidence and interview all the witnesses. Particularly, they should have gotten more information off Emily's cell phone, including the Facebook messages exchanged between Ogwangi and Emily. Defense counsel asked the jury, "Don't you want to know what the Facebook messages say between these two?" Defense counsel pointed out that the officers never interviewed Sierra. Defense counsel specifically asked, "Why didn't the police issue any subpoenas for any of the records that we're talking about?"

In response, the State, during its closing argument, stated, "Now as far as all this missing information that Ms. Swain was talking about and the subpoena power, you know who else has subpoena power, the defense. If Ms. Swain thought that those things that she identified would've been helpful in poking holes in the State's case." The defense objected, arguing it was burden shifting. The trial court ultimately overruled the objection but warned the State to be careful. The State continued,

> "[T]he State has the burden and that burden never shifts. The burden of proof beyond a reasonable doubt, highest standard in the land. We own that [] burden 100 percent. That's our job.
>
> "That being said, the defense has subpoena power if they thought that they could poke holes in the State's case. They had subpoena power to get whatever Facebook messages they're talking about. To bring in Sierra or whoever may have refuted the State's witnesses versions of events."

On appeal, Ogwangi argues the State went too far by suggesting the defense had a duty to use its subpoena power to call witnesses and affirmatively poke holes in the State's case. In doing so, the State illegally shifted the burden of proof to the defense.

The State argues the remark was fair rebuttal, not erroneous burden shifting. Defense counsel argued the police failed to collect all the evidence and interview all the witnesses. The prosecutor emphasized that the State's burden never shifted to the defense.

The rule is fundamental to our criminal jurisprudence. It is improper for a prosecutor to attempt to shift the burden of proof to the defendant or to misstate the State's burden of proof. But prosecutors are granted considerable latitude to address the weaknesses of the defense. "[A] prosecutor does not shift the burden of proof by pointing out the absence of evidence to support the defense argument that there are holes in the State's case." *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016). If the defense comments on the State's failure to call certain witnesses or admit certain evidence, the State can inform the jury that the defense has the power to subpoena witnesses and introduce evidence. 304 Kan. at 838. "But when discussing the defense's subpoena power, the State crosses the line when it suggests the defendant must disprove the State's case or offer evidence to support a finding of reasonable doubt." *State v. Anderson*, 318 Kan. 425, 437, 543 P.3d 1120 (2024). The line between permissible and impermissible argument is context dependent. 318 Kan. at 439.

In *Pribble*, the defense argued that law enforcement officers did not collect any fingerprint or DNA evidence during the search of Pribble's house and that the jury did not hear from several witnesses who could have corroborated Pribble's claim of being out of town when the drugs came into his house. The prosecutor responded:

> "And he says that beyond a reasonable doubt is the highest burden in the land. Absolutely can't be any more.
>
> . . . .
>
> "He says the State didn't prove anything. Well, ladies and gentlemen, the defense has the exact same ability to subpoena witnesses. And if he was at Fall River, his sister could have told us. His nephew could have told us there was a big party. Terry Moore could have come in and said none of this stuff was there when I left the house. Alex

31

Martinez could have come in and said, yeah, I was at the house. And guess who we heard from. No one. . . .

"It is my burden to prove this case, and the State has done that." 304 Kan. at 837.

The *Pribble* court concluded the prosecutor did not improperly shift the burden of proof when he commented about Pribble's failure to call alibi witnesses who could have corroborated his theory of the case. The prosecutor's comments were "a fair rebuttal to defense counsel's argument" that the State failed to collect certain evidence or call alibi witnesses. 304 Kan. at 838.

Then, in *State v. Hachmeister*, 311 Kan. 504, 515-16, 464 P.3d 947 (2020), defense counsel argued the State had "tunnel vision" and failed to investigate the victim's other lovers that she met online on dating websites. Hachmeister's defense was that one of those lovers killed her. The prosecutor responded,

"'I've got the burden, absolutely. And I brought in witness after witness after witness to show you how the evidence adds up in its totality. Even if you just take the crime scene evidence by itself and the nature of the crime, it points to Jason Hachmeister beyond a reasonable doubt. . . . But you know what, they don't have a burden, absolutely true. But if they want to bring forth assertions that poke holes in reasonable doubts or poke holes in my case, they got the same subpoena power, they got the same process of authorizing tests that I do. And if they thought that William Johnstrom had something to add in, they could have put him up there, just like we could have. Right? If he's so easy to track down, he didn't use fake names or emails on his PlentyofFish.com cite, well, we didn't figure that out. We didn't find it.'" *Hachmeister*, 311 Kan. at 516.

The *Hachmeister* court held the prosecutor's comments were an appropriate rebuttal to the defense's arguments.

In *Anderson*, defense counsel highlighted weaknesses in the State's case and argued the State was asking the jury to fill in the blanks despite a lack of evidence

32

supporting the State's case. Defense counsel challenged the credibility of two witnesses, emphasizing that they exchanged information about the case through letters. In rebuttal, the prosecutor commented:

> "'[T]here's been talk about letters throughout the course of this case. Well you guys were writing letters back and forth, right? These women were in the jail, they were writing letters, those letters mentioned [Hunter], didn't they? Now you haven't seen the letters, and this is another important point.
> "'If there is a piece of evidence that would prove or would show that . . . there's a reasonable doubt as to the defendant's guilt, the defendant has the same subpoena power that the State has. The defendant can call witnesses to come in here to bring in evidence and to show you things. And if there is some letter out there that indicates that these women are lying or if they—'" 318 Kan. at 436.

The *Anderson* court held that "[t]he State did not simply point out that Anderson had the power to present evidence favorable to the defense. Rather, the State's argument coupled the defense's subpoena power with the reasonable doubt standard." 318 Kan. at 438. The State suggested Anderson had the burden to present evidence—the letters—before the jury could find reasonable doubt as to his guilt. The State's comment about Anderson's failure to produce the letters could not be characterized as fair rebuttal because defense counsel never faulted the State for failing to introduce the letters. The court held that the State's argument "fell just outside the wide latitude afforded prosecutors in arguing a case." 318 Kan. at 439.

In our view, this case is more like *Pribble* and *Hachmeister*. Here, unlike in *Anderson*, the prosecutor's comments were a fair rebuttal to specific comments by defense counsel. Defense counsel brought up the State's subpoena power and the State's failure to introduce the Facebook messages and to interview Sierra. The prosecutor did not tie the defense's subpoena power to the reasonable doubt standard. The prosecutor

33

made clear that the State had the reasonable doubt burden and that the burden never shifted.

*The prosecutor comments on the nature of sexual assault examinations.*

During the defense closing argument, defense counsel commented on the lack of outward signs of trauma noted on the nurse's examination report. "We have the results of a SANE exam that show [Emily] went in, was examined from head to toe and didn't have a scratch on her body." Defense counsel argued that certain details of the assault recorded in the report—that he sucked on her breasts and neck—sounded "much more like the sorts of activities that would be involved in a consensual sexual encounter."

During its closing argument, the State commented that the sexual assault examination was a "very invasive procedure." The prosecutor said, "[I]f you look at Sue Kiger's report, you may choose to ask yourselves what in this report in any way indicates that this was a consensual encounter? By their sure nature, these examinations and these reports are not generated resulting from a consensual encounter."

On appeal, Ogwangi argues the State shifted its burden of proof and misstated the evidence by saying the very nature of the sexual assault examination proved a lack of consent. It was not Ogwangi's burden to prove the sex was consensual. And the nurse testified the examination could not reveal whether the sex was consensual. He cites *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004). The State argues the prosecutor's remark did not burden Ogwangi to affirmatively produce evidence and that the State did not argue the result of the exam proved the sex was nonconsensual.

In *Tosh*, the prosecutor asked, "'[I]s there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen?'" The court found that, in

34

context with other remarks by the prosecutor, the questions were improper attempts to shift the burden of proof to Tosh. 278 Kan. at 92.

Here, the prosecutor did not suggest that Ogwangi had the burden to prove the sex was consensual. The prosecutor was directly responding to the comments of defense counsel. As we held above, this was fair rebuttal. The prosecutor also did not misstate the evidence. The prosecutor did not suggest that Emily's abrasions showed the sex was nonconsensual. The prosecutor argued that Emily submitted herself to an invasive exam, which itself suggested the sex was nonconsensual. We find no prosecutor error here.

*We will not reverse for cumulative error.*

Finally, Ogwangi argues the State cannot prove the cumulative effect of all the claimed errors harmless beyond a reasonable doubt.

It is true that cumulative trial errors, when considered together, may require reversal of the defendant's conviction when all the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022). The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

There was only one error—the prosecutor's use of the puzzle analogy, and we have held it to be harmless. Therefore, there is no cumulative error.

35

Distilled to its essence, this jury trial answered one question. Was the sexual intercourse that happened between two people forced or consensual? This prosecution focused on the complaining witness' claim of forced sexual intercourse because the accused did not deny the fact that intercourse occurred. Ogwangi did not testify but built his defense by arguing that the police investigation was inadequate and amounted to confirmation bias. That is to say that the police only looked for evidence confirming their theory of guilt and did not actually prove that he raped Emily.

The jury had to decide which version of the facts were to be believed. Guided by the judge's instructions on the law that applied to this prosecution, 12 people decided the guilt or innocence of the accused. And, they decided that Emily was telling the truth. Our review of the record reveals that while this was not a perfect trial it was a fair trial with but one error and it was, under the circumstances, not a reversible error.

Affirmed.